# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RITE AID CORPORATION; RITE AID HDQTRS. CORP.; and RITE AID OF MARYLAND, INC. d/b/a MID-ATLANTIC CUSTOMER SUPPORT CENTER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N19C-04-150 EMD CCLD |
| ACE AMERICAN INSURANCE COMPANY; JURY TRIAL ILLINOIS UNION INSURANCE COMPANY; DEMANDED ACE PROPERTY & CASUALTY COMPANY; FEDERAL INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY; AMERICAN ZURICH INSURANCE COMPANY; CONTINENTAL INSURANCE COMPANY; ENDURANCE AMERICAN INSURANCE COMPANY; GREAT AMERICAN ASSURANCE COMPANY; GREAT AMERICAN INSURANCE COMPANY OF NEW YORK; GREAT AMERICAN SPIRIT INSURANCE COMPANY; LIBERTY INSURANCE UNDERWRITERS, INC.; ST. PAUL FIRE AND MARINE INSURANCE COMPANY; and XL INSURANCE AMERICA, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: June 5, 2020
Decided: September 22, 2020

*Upon Plaintiffs Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and Rite Aid of Maryland Inc.'s Motion for Partial Summary Judgment,*
***GRANTED***

*Upon Defendants ACE American Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company, and Federal Insurance Company's Motion for Partial Summary Judgment,*
***DENIED***

Jody C. Barillare, Esquire, Morgan, Lewis & Bockius LLP, Wilmington, Delaware, Gerald P. Konkel, Esquire, Christopher Popecki, Esquire, Morgan, Lewis & Bockius LLP, Washington, D.C. *Attorneys for Plaintiffs Rite Aid, Corporation, Rite Aid Hdqtrs. Corp., and Rite Aid of Maryland Inc.*

Marc S. Casarino, Esquire, White and Williams LLP, Wilmington, Delaware, Paul R. Koepff, Esquire, Clyde & Co US LLP, New York, New York, Robert Mangino, Esquire, Clyde & Co US LLP, Florham Park, New Jersey. *Attorneys for Defendants ACE American Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company, and Federal Insurance Company*

Robert J. Katzenstein, Esquire, Robert K. Beste, Esquire, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, Mitchell J. Auslander, Esquire, Christopher J. St. Jeanos, Esquire, Willkie Farr & Gallagher LLP, New York, New York. *Attorneys for Defendants Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa.*

Deirdre M. Richards, Esquire, Fineman Krekstein & Harris P.C., Wilmington, Delaware, Hema Patel Mehta, Esquire, Chartwell Law, Philadelphia, Pennsylvania. *Attorneys for Defendant Endurance American Insurance Company*

David J. Soldo, Esquire, Morris James LLP, Wilmington, Delaware. *Attorney for Great American Assurance Company, Great American Insurance Company of New York, and Great American Spirit Insurance Company*

**DAVIS, J.**

## I. INTRODUCTION

This insurance coverage dispute is assigned to the Complex Commercial Litigation Division of the Court. Plaintiffs Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and Rite Aid of Maryland Inc. d/b/a Mid-Atlantic Support Center (collectively, "Rite Aid") have been sued in over 1,143 lawsuits by governmental entities, third-party payors of medical care, and individuals seeking damages for costs arising out of Rite Aid's distribution of opioids ("Opioid Lawsuits").[1]

---

[1] Rite Aid's Op. Br. in Supp. of Its Mot. for Partial Summ. J. Requiring Def. ACE American Insurance Company to Pay or Reimburse Rite Aid's Defense Cost for Opioid Lawsuits ("Rite Aid's Motion") at 1.

The Opioid Lawsuits allege that Rite Aid knowingly distributed opioids to its own local pharmacies, and separately allege that local Rite Aid pharmacies improperly dispensed prescription opioids to its customers, which contributed and perpetuated drug abuse, addiction and resulting injuries or death.[2] Rite Aid sought coverage for the Opioid Lawsuits under ACE policy XSL G27390900 (the "Policy" or the "2015 Policy") issued by Defendant ACE American Insurance Company ("ACE").[3] Chubb (as defined below) denied coverage under the Policy for any of Rite Aid's costs incurred in defending any of the Opioid Lawsuits. In response, Rite Aid initiated this action on April 16, 2019.

On July 19, 2019, Rite Aid filed its Motion for Partial Summary Judgment Requiring Defendant ACE American Insurance Company to Pay or Reimburse Rite Aid's Defense Costs for Opioid Lawsuits ("Rite Aid's Motion"). On January 31, 2020, ACE filed ACE's Memorandum of Law in Opposition to Rite Aid's Motion for Partial Summary Judgment.

Also, on January 31, 2020, two group of non-Chubb insurers filed responses to Rite Aid's Motion: (i) Defendants Great American Assurance Company, Great American Insurance Company of New Yok, Great American Spirit Insurance Company ("Great American Defendants"); and (ii) Defendants Endurance American Insurance Company ("Endurance") and National Union Fire Insurance Company of Pittsburgh, Pa., ("National Union" and, with Endurance, "Certain Excess Insurer Defendants"). The Great American Defendants filed the Response of Great American Assurance Company, Great American Insurance Company of New Yok, Great American Spirit Insurance Company to Rite Aid's Motion for Partial Summary Judgment Requiring Defendant ACE American Insurance Company to Pay or Reimburse Rite Aid's Defense Costs for Opioid Lawsuits ("Great American Defendants' Response"). The

---

[2] Memorandum of Law in Supp. Of Chubb's Mot. for Partial Summ. J. ("Chubb's Mot.") at 1.
[3] Rite Aid's Mot. at 2.

3

Certain Excess Insurer Defendants filed the Certain Excess Insurer Defendants' Memorandum in Connection with and in Opposition to Plaintiffs' Motion for Partial Summary Judgment Requiring Defendant ACE to Pay Defense Costs ("Certain Excess Insurer Defendants' Response").

On February 21, 2020, Rite Aid filed Rite Aid's Reply Brief in Further Support of its Motion for Partial Summary Judgment Requiring ACE to Pay or Reimburse Rite Aid's Defense Costs for Opioid Lawsuits and Rite Aid's Reply to Certain Insurers' Response to Rite Aid's Motion for Partial Summary Judgment Requiring ACE to Pay or Reimburse Rite Aid's Defense Costs for Opioid Lawsuits ("Rite Aid's Reply to Certain Insurers' Response"). The Reply to Certain Insurers' Response addressed both the Certain Excess Insurer Defendants' Response and the Great American Defendants' Response.

On January 31, 2020, Defendants ACE, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company (i/p/a ACE Property & Casualty Company), Federal Insurance Company (collectively, "Chubb")[4] submitted a Motion for Partial Summary Judgment ("Chubb's Motion"). On February 21, 2020, Rite Aid filed Rite Aid's Memorandum of Law in Opposition to Chubb's Motion for Partial Summary Judgment. On March 9, 2020, Chubb filed its Reply Memorandum in Support of Chubb's Motion for Partial Summary Judgment.

The Court held a hearing on Rite Aid's Motion and Chubb's Motion on April 20, 2020. At the hearing, the Court asked the parties to provide supplemental information regarding recent developments in the MDL Opioid Lawsuits (as defined below). After that, the Court took the

---

[4] For purposes of this Opinion and to avoid confusion, the Court will use Chubb to mean multiple parties, including ACE. Any references to Chubb in this Opinion will also mean ACE, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company (i/p/a ACE Property & Casualty Company) and Federal Insurance Company. This is because Chubb is handling these claims on behalf of ACE, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company (i/p/a ACE Property & Casualty Company) and Federal Insurance Company. Affidavit of Ron Chima ("Chima Aff."), at Ex. E.

4

matters under advisement. This is the Court's opinion on the motions. For the reasons set forth below, the Court **GRANTS** Rite Aid's Motion and **DENIES** Chubb's Motion.

## II. BACKGROUND

Rite Aid is the third largest retail drugstore chain in the United States, operating nearly 2,500 stores across the country.[5] On December 5, 2017, the United States Judicial Panel on Multidistrict Litigation began to consolidate federal Opioid Lawsuits "involv[ing] common questions of fact" into a multi-district litigation before the United States District Court for the Northern District of Ohio (the "MDL Opioid Lawsuits") after governmental entities, third-party payors of medical care, and other plaintiffs began filing suit against manufacturers and suppliers of opioids.[6] The governmental entities seek to recover billions in governmental and economic costs allegedly incurred in providing a wide array of public services in response to the influx of opioids into their communities such as increased expenses for first responders, autopsies, morgues, drug rehabilitation, foster care, and drug-related criminal activity.[7]

The MDL Opioid Lawsuits include the "Track One" bellwether litigation suits (the "Track One Lawsuits"), which consist of claims by governmental entities alleging that Rite Aid chased profits while turning a blind eye to the devastating epidemic.[8] The Track One Lawsuits initially involved *County of Summit, Ohio v. Purdue Pharma L.P.*, Case No. 18-OP-45090 (N.D. Ohio) (the "*Summit*" lawsuit), *County of Cuyahoga, Ohio v. Purdue Pharma L.P.*, Case No. 17-OP-45004 (N.D. Ohio) (the "*Cuyahoga*" lawsuit), and *City of Cleveland, Ohio v. Purdue*

---

[5] Chubb's Mot. at 1; ACE's Memorandum of Law in Opp. to Rite Aid's Mot. for Partial Summ. J. ("ACE's Opp.") at 1.

[6] *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017); *see also* Declaration of Gerald P. Konkel ("Konkel Decl."), Ex. F, *In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804-DAP, Doc. ("MDL Doc.") 3151 (N.D. Ohio Feb. 5, 2020) (stating nearly 2,000 Opioid Lawsuits transferred to MDL since 2017).

[7] *Id*. at 1–2.

[8] *Id*. at 2.

*Pharma L.P.*, Case No. 18-op-45132 (N.D. Ohio) (the "*Cleveland*" lawsuit).[9] On February 25, 2019, the *Cleveland* lawsuit and the City of Akron—a plaintiff in the *Summit* lawsuit—were dropped from the trial.[10]

On April 27, 2018, two days after being named a defendant of the Track One Lawsuits, Rite Aid tendered and provided timely notice of the Opioid Lawsuits, including the Track One Lawsuits, to its insurers, including under the 2015 Policy.[11]

## A. THE CHUBB POLICIES

Unlike Rite Aid's Motion, which only involves the 2015 Policy, Chubb's Motion involves nineteen policies (the "Chubb Policies") issued by the Chubb Companies that contain "identical or materially similar terms."[12] Chubb argues that none of the Chubb Policies provide coverage for the defense costs in the Track One Lawsuits.

### i. The 2015 Policy

The 2015 Policy provides:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "property damage" to which the insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "property damage" to which this insurance does not apply.

. . .

e. Damages because of "personal injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "personal injury."[13]

---

[9] *See* Konkel Decl., ¶¶ 5–6.
[10] Chima Aff. ¶ 25.
[11] Rite Aid's Mot. at 2.
[12] Chubb's Motion at 4–5; Declaration of Paul R. Koepff ("Koepff Decl.") ¶¶ 4–20, Exs. A–Q; *see* Chima Aff. Ex., A.
[13] Chima Aff., Ex. A.

The Policy "applies" to "personal injury" that "occurs during the policy period" and "is caused by an 'occurrence,'" but also defines "personal injury" to include "any continuation, change, or resumption of that 'personal injury'. . . after the end of the policy period."[14]

"Personal injury" is defined in part as "bodily injury."[15] "Bodily injury" is further defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[16] Such damages are covered so long as they were "caused by an occurrence.[17] An "occurrence," with respect to "bodily injury," is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[18] The Policy states "[d]amages because of 'personal injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'personal injury.'"[19] It also states that Chubb has a "duty to defend the insured against any 'suit' seeking those damages."[20]

The Policy provides that the duty to defend "will attach only when the entire amount of the 'Retained Limit' has been paid and then only in excess of the 'Retained Limit.'"[21] The Policy further states that there will be "no reduction of the 'Retained Limit' because of payment of claims or 'suits' arising from claims or 'suits' for which coverage is not afforded."[22] The Policy has a $3,000,000 "Retained Limit" that is "the most an insured will pay for . . . [d]amages and Supplementary Payments under Coverage A because of all 'personal injury' . . . arising out

---

[14] *Id.*
[15] *Id.* at RA0002535.
[16] *Id.* at RA0002532.
[17] *Id.* at RA0002519.
[18] Id. at RA0002535.
[19] *Id.* at RA0002520.
[20] *Id.* at RA0002519.
[21] *Id.* at RA0002573.
[22] *Id.*

of any one occurrence."[23]  The Policy characterizes "Supplementary Payments" as the expenses incurred in the defense of such suits.[24]

### ii. The 2018 Policy's Unique Governmental Entity Suit Exclusion

ACE also issued a primary policy to Rite Aid, policy XSL G27874642, for the 2018 policy period after the first Opioid Lawsuits were filed ("2018 Policy").[25]  The 2018 Policy has the same standard insuring agreement as the other ACE American policies.  The Court notes, however, that it contains a unique endorsement that "changes" the scope of coverage provided under ACE's standardized insuring agreement supports Rite Aid's understanding of the 2015 Policy's coverage.  The endorsement states that it "CHANGES THE POLICY" and thus instructs the insured to "PLEASE READ IT CAREFULLY."[26]  The endorsement excludes "opioid and narcotics liability" claims brought by "any 'governmental entity,' health or group insurer" under "COVERAGE A. PERSONAL INJURY AND PROPERTY DAMAGE LIABILITY"[27]  Chubb issued the 2018 Policy with this exclusion after the first Opioid Lawsuits were asserted in 2017.[28]  No Chubb policy subject to Chubb's Motion contains a similar "opioid" and/or "governmental entity" suit exclusion.

## B. THE TRACK ONE LAWSUITS

Rite Aid's Motion concerns the allegations in the complaints of the *Summit*, *Cuyahoga*, and *Cleveland* lawsuits.[29]  Rite Aid alleges that those three lawsuits, like the other MDL Opioid Lawsuits, include substantively similar allegations that Rite Aid acted negligently in distributing

---

[23] *Id.* at RA0002572.
[24] *Id.* at RA0002519, RA0002525.
[25] Chima Aff., Ex. C.
[26] *Id.* at RA0004349–50.
[27] *Id.*
[28] Chima Aff., ¶ 7.
[29] Rite Aid's Submission Regarding Impact of Sixth Circuit's Mandamus Decision and Judge Polster's April 16, 2020 Order Regarding Track 1b And Track Three on Pending Summary Judgment Motions ("Rite Aid's Submission") at 2.

opioids, resulting in damages including for costs of medical care for addicted individuals and for opioid overdose deaths. Rite Aid's Motion seeks declarations that Rite Aid satisfied the per occurrence retention and ACE has a duty to defend based on the Track One Lawsuits' pleadings and defense costs incurred as of July 19, 2019—the date when its Motion was filed.[30]

On July 19, 2019, the operative pleadings in the Track One Lawsuits were the *Summit* and *Cuyahoga* Third Amended Complaints.[31] These Third Amended Complaints included causes of action for negligence, statutory and common law public nuisance, and other claims against opioid "supply chain" entities including Rite Aid, all arising out of their alleged failure to prevent diversion and oversupply of opioids.[32] This allegedly caused a "public health epidemic" of "addiction, abuse, overdose and death," and proximately caused governmental entities' "costly responses" including emergency services, medical care, and morgue operations.[33] Specifically, the negligence cause of action alleged:

- Breaches of duties through "Distributing by distributors" and their "Choosing not to effectively monitor for suspicious orders" and related failures;

- "Defendants were negligent by marketing, distributing, and selling opioids" leading to illicit diversion;

- "Defendants had control over their conduct in Plaintiffs' communities" by "controll[ing] the systems they developed to prevent diversion . . . .";

- "As a direct and proximate result of Defendants' negligence," Plaintiffs "have suffered and will continue to suffer economic damages including, but not limited to, significant expenses for…emergency, health, . . . and other services";

---

[30] *Id.*

[31] Rite Aid's Memorandum of Law in Opp. to Chubb's Mot. for Partial Summ. J. at 7.

[32] Chima Aff., Ex. L, ¶ 9 (hereinafter, "Summit TAC"); Ex. N, ¶ 9 (hereinafter, "Cuyahoga TAC"). On August 19, 2019, the plaintiffs in the Track One Lawsuits dismissed their causes of action for negligence, common law fraud, injury through criminal acts, and unjust enrichment. Konkel Decl., Ex. B, MDL Doc. 2487 (N.D. Ohio Aug. Aug. 19, 2019).

[33] Summit TAC, ¶¶ 18, 20, 725; Cuyahoga TAC, ¶¶ 17, 19, 677.

- Defendants' misconduct is "ongoing and persistent"; and

- Defendants' conduct "does not concern a discrete event or discrete emergency…."[34]

The common law public nuisance counts are premised on the same alleged inactions and inadequate actions as the negligence cause of action. While the Track 1B Plaintiffs dismissed the negligence counts in the Track 1B operative complaints on August 19, 2019, the public nuisance counts remain unchanged.[35]

On November 20, 2019, the plaintiffs in the Track One Lawsuits filed Amendments by Interlineation.[36] The Amendments by Interlineation were substantively identical.[37] The Amendments by Interlineation filed in the *Summit* and *Cuyahoga* lawsuits made revisions to the preexisting public nuisance count and alleged new details regarding National Retail Pharmacies' alleged "distributing and dispensing" conduct.[38] When the plaintiffs were granted permission to amend their Third Amended Complaints, MDL District Court Judge pointed out that "although some additional discovery will be necessary to address dispensing claims, much of the foundational discovery and virtually all of the discovery regarding Plaintiffs has already been done [with respect to the dispensing claims]."[39]

Chubb's Motion was filed on January 31, 2020. At that time, the operative complaints were the Third Amended Complaints as amended by the Amendments by Interlineation.[40]

---

[34] Rite Aid's Reply Brief in Further Support of its Motion for Partial Summary Judgment Requiring ACE to Pay or Reimburse Rite Aid's Defense Costs for Opioid Lawsuits ("Rite Aid's Reply Br.") at 6–7 (citing Summit TAC at ¶¶ 1046, 1050, 1054, 1063, 1066 & 1067; Cuyahoga TAC at ¶¶ 1089, 1093, 1097, 1106, 1109, & 1110).

[35] Rite Aid's Submission at 4 n.10.

[36] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 ("Opioid MDL") (Nov. 20, 2019) ECF Nos. 2943, 2944. F.R.C.P. 15(c)(1)(B) provides that amendments "relate back" when the newly asserted claim arises out of the "conduct, transaction or occurrence set out or attempted to be set out" in the pleading being amended. *See, e.g., Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004). Moreover, these Amendments are "interlineated" such that they are part and parcel of the original Third Amended Complaints.

[37] *See, e.g.*, Summit TAC, ¶ 168; Cuyahoga TAC, ¶ 156.

[38] *Id.*

[39] Opioid MDL (Nov. 19, 2019) ECF No. 2940, p. 3.

[40] Chubb's Mot. at 5.

Chubb's Motion is based on the pleadings in the *Summit* and *Cuyahoga* pleadings, consisting of Second Amended Complaints, Third Amended Complaints, and the Amendments by Interlineation.[41] Chubb's Motion concerns whether the *Summit* and *Cuyahoga* lawsuits allege claims for "damages" "because of" "personal injury."

On April 15, 2020, the Sixth Circuit issued an opinion overruling the MDL District Court Judge's November 2019 decision,[42] which permitted the counties to amend their complaints to assert the dispensing claims timely.[43] Specifically, the Sixth Circuit stated that [t]he petition for a writ of mandamus is granted, and the cases are remanded with instructions to strike each County's November 2019 "Amendment by Interlineation."[44] As a result of the Sixth Circuit's decision, in his April 16 Order, the MDL District Court Judge created a new litigation track to resolve: "(1) only public nuisance claims (2) against only the pharmacy defendants (3) in their roles as distributors and dispensers."[45]

Given this, the Court will not consider the new allegations made in the Amendments by Interlineation. Instead, the Third Amended Complaints remain the operative complaints.[46] As the negligence counts and the public nuisance counts in the Third Amended Complaints allege the same source of Rite Aid's alleged liability and as between the two, the public nuisance counts remain pending, resolving Rite Aid's Motion and the Chubb's Motion calls for consideration of the Third Amended Complaints' public nuisance counts.[47]

As pled from their inception and currently, the Track One Lawsuits:

---

[41] *Id.* (citing *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 ("Opioid MDL") (N.D. Ohio Dec. 23, 2019) ECF No. 3044 p. 1 FN1, ECF No. 3045 p. 1 n.1.).

[42] *In re: National Prescription Opiate Litig.*, case no. 20-3075, dkt no. 50–53 (6th Cir. April 15, 2020) ("Mandamus Order").

[43] *Id.* at 9.

[44] *Id.*

[45] *See* Rite Aid's Submission, Ex. C, April 28, 2020 Pharmacy Defendants' Position Statement and Objection.

[46] Rite Aid's Submission at 3.

[47] *Id.* at 3–4.

take[] aim at the two primary causes of the opioid crisis: (a) a marketing scheme [by Marketing Defendants]…; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market.[48]

The Track One Lawsuits also have consistently pled:

[o]n the supply side, the crisis was fueled and sustained by . . . manufacturers, distributors, and pharmacies (together "Defendants"), who failed to maintain effective controls over the distribution of prescription opioids . . . .[49]

### i. The Cuyahoga Action

The second and third amended complaints in the *Cuyahoga* action assert claims against Rite Aid seeking to recover specific costs borne by Cuyahoga resulting from alleged conduct by Rite Aid entities operating in, or directly impacting Cuyahoga.[50] Cuyahoga alleges that as a "direct and proximate result" of Rite Aid's failure to "effectively prevent diversion" and "monitor, report, and prevent suspicious orders," it "suffered and will continue to suffer economic damages."[51] Cuyahoga claims that Rite Aid's actions "fell far short of legal requirements" and "contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids."[52] Cuyahoga alleges that as a "practical and financial matter" it was "saddled with an enormous economic burden," with "several departments [incurring] direct and specific response costs that total tens of millions of dollars."[53] The financial strain was allegedly evidenced in "annual costs associated with treatment, criminal justice, and lost

---

[48] Summit TAC, ¶ 9; Chima Aff., Ex. M (hereinafter, "Summit SAC"), ¶ 9; Cuyahoga TAC, ¶ 9; Chima Aff., Ex. O (hereinafter, "Cuyahoga SAC"), ¶ 9.
[49] Summit TAC, ¶ 14; Summit SAC, ¶ 14; Cuyahoga TAC, ¶ 14; Cuyahoga SAC at ¶ 14.
[50] *See* Cuyahoga SAC ¶¶ 715–75; Cuyahoga TAC ¶¶ 729–89.
[51] *See* Cuyahoga SAC ¶¶ 621, 1053, 1092; Cuyahoga TAC ¶¶ 635, 1067, 1106.
[52] Cuyahoga SAC ¶¶ 620–21; Cuyahoga TAC ¶¶ 634–35.
[53] Cuyahoga SAC ¶ 693; Cuyahoga TAC ¶ 707.

productivity."[54]  These costs include the costs of forming an Opiate Task Force in 2010.[55]

Cuyahoga claims that the damages sought are "of a different kind and degree than Ohio citizens at large," "can only be suffered by [Cuyahoga]," and "are not based upon or derivative of the rights of others."[56]  Cuyahoga states that it "[does] not seek damages for death, physical injury to person, emotional distress, or physical damages to property."[57]  Cuyahoga alleges that the damages sought are for "abatement, recovery of abatement costs, injunctive relief, and to prevent injury and annoyance from any nuisance."[58]

### ii. The Summit Action

Summit asserts claims against entities in the opioid distribution "supply chain," including Rite Aid, that allegedly "failed" or "refus[ed] to monitor and restrict the improper distribution of [opioid] drugs."[59]  Summit alleges in detail the opioid-related bodily injury, sickness, disease, and death fueled by the "proliferation of opioid pharmaceuticals [since] the late 1990s."[60] Summit alleges how taking opioids "produce[s] multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression."[61]  Summit claims that users develop tolerance and take "progressively higher doses," which risks "arrest[ing] respiration altogether" and causes "more severe" withdrawal symptoms. Withdrawal symptoms

---

[54] Cuyahoga SAC ¶ 694; Cuyahoga TAC ¶ 708.
[55] Cuyahoga SAC ¶ 684; Cuyahoga TAC ¶ 698.
[56] Cuyahoga SAC ¶¶ 1060–61; Cuyahoga TAC ¶¶ 1074–75.
[57] Cuyahoga SAC ¶ 1066; Cuyahoga TAC ¶ 1080.
[58] Cuyahoga SAC ¶ 1023; Cuyahoga TAC ¶ 1037.
[59] Summit TAC ¶¶ 1, 9, 14; *accord* Summit SAC ¶¶ 1, 9, 14; Cuyahoga TAC ¶¶ 1, 9, 14; Cuyahoga SAC ¶¶ 1, 9, 14; Chima Aff., Ex. P ("Cleveland SAC") ¶¶ 1, 9, 14.
[60] Summit TAC ¶7; *accord* Summit SAC ¶ 7; Cuyahoga TAC ¶7; Cuyahoga SAC ¶ 7; Cleveland SAC ¶ 7.
[61] Summit TAC ¶124; *accord* Summit SAC ¶ 130; Cuyahoga TAC ¶ 112; Cuyahoga SAC ¶ 98; Cleveland SAC ¶ 99.

13

allegedly include "severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms . . . ."[62]

Summit contends that the spread of opioids has resulted in "skyrocketing" rates of opioid "addiction, overdose and death," as well as "black markets" for diverted prescription opioids that cause heroin and fentanyl abuse.[63] These trends allegedly caused extensive "[i]njury and illness in Ohio" and across the country, including not only the foregoing overdose deaths and withdrawal symptoms, but also, *inter alia*, "an increase in Hepatitis C…tied to intravenous injection of opioids"; potential "suicides believed to be related to opioid withdrawal"; and "neonatal abstinence syndrome," a "painful condition" for "drug-exposed infants."[64]

### 1. Costs incurred

Summit alleges that Rite Aid caused this "public health epidemic" and gave rise to the "extraordinary costs" for overdose deaths, medical care, and other public health, safety, and criminal justice services, for which it seeks redress.[65] Summit alleges that the consequences of Rite Aid's actions burdened it with "severe and far-reaching public health, social services, and criminal justice consequences" that "are not the normal or typical burdens of government programs and services."[66] Summit avers, "necessary and costly responses to the opioid crisis include," *inter alia*, "handling of emergency responses to overdoses," "providing addiction treatment," "treating opioid-addicted newborns in neonatal intensive care units," and "burying

---

[62] Summit TAC ¶137; *accord* Summit SAC ¶ 143; Cuyahoga TAC ¶ 125; Cuyahoga SAC ¶ 111; Cleveland SAC ¶ 112.
[63] Summit TAC ¶ 138; *accord* Summit SAC ¶ 144; Cuyahoga TAC ¶ 126; Cuyahoga SAC ¶112; Cleveland SAC ¶ 113.
[64] Summit TAC ¶ 18; *see id*. ¶¶ 4–6, 16; *accord* Summit SAC ¶ 18; Cuyahoga TAC ¶17; Cuyahoga SAC ¶ 17; Cleveland SAC ¶ 17.
[65] Summit TAC ¶¶ 1, 18, 20–21, 28, 30, 34–37; *see id.* ¶¶ 715–746; *accord* Summit SAC ¶¶ 1, 18, 20–21; Cuyahoga TAC ¶¶ 1, 17; Cuyahoga SAC ¶¶1, 17, 19–20; Cleveland SAC ¶¶ 1, 17, 19–20.
[66] *See* Summit SAC ¶¶ 20–21; Summit TAC ¶¶ 20–21.

the dead."[67] Summit alleges that for the period between 2012 and 2016, it incurred approximately $66 million in costs for "special programs over and above [Summit's] ordinary public services."[68]

These costs include "significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services."[69] For example, "[f]rom 2012 to 2017 . . . the County's Children Services Board . . . incurred nearly $24 million in costs, and the County's Alcohol, Drug Addiction, and Mental Health Services Board [ ] more than $10 million [in] costs related directly to the opioid epidemic."[70] Summit alleges that the harms were "of a different kind and degree than Ohio citizens at large," "can only be suffered by [Summit]," and "are not based upon or derivative of the rights of others."[71] Summit claims "National Retail Pharmacies" including Rite Aid "were or should have been aware" or "knew or reasonably should have known" of multiple breaches of duties of care with respect to opioid distribution, including alleged "fail[ure] to: (a) control the supply chain; (b) prevent diversion [of drugs for illicit uses]; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids. Plaintiffs allege such "actions and omission[s]…have contributed significantly to the opioid crisis[.]" [72]

Like Cuyahoga, Summit alleges that it "[does] not seek damages for death, physical injury to person, emotional distress, or physical damages to property."[73] Summit similarly seeks

---

[67] Summit TAC ¶ 20; *accord* Summit SAC ¶ 20; Cuyahoga TAC ¶ 19; Cuyahoga SAC ¶ 19; Cleveland SAC ¶ 19.
[68] *See* Summit SAC ¶¶ 744, 993; Summit TAC ¶¶ 745, 994.
[69] Summit SAC ¶¶ 1024, 1062; Summit TAC ¶¶ 1025, 1063.
[70] Summit SAC ¶ 734; Summit TAC ¶ 735.
[71] Summit SAC ¶¶ 1031–32; Summit TAC ¶¶ 1032–33.
[72] Summit TAC ¶¶ 17, 518, 656–58; *accord* Summit SAC ¶¶ 517, 656–58; Cuyahoga TAC ¶¶ 502, 632–34; Cuyahoga SAC ¶¶ 488, 581–88; Cleveland SAC ¶¶ 487, 619–21.
[73] Summit SAC ¶ 1037; Summit TAC ¶ 1038.

"abatement, recovery of abatement costs, injunctive relief, and to prevent injury and annoyance from any nuisance."[74]

### 2. Rite Aid as a "Wholesale Distributor"

As a "wholesale distributor," Rite Aid allegedly "reaped enormous financial rewards by refusing to monitor and restrict the improper distribution of drugs."[75] Rite Aid's actions purportedly "fell far short of legal requirements" and "contributed significantly to the opioid crisis."[76] Summit specifically identified Rite Aid's alleged failure to: "control the supply chain," "prevent diversion," "report suspicious orders," and "halt shipments of opioids in quantities [it] knew or should have known could not be justified and were indicative of serious problems of overuse of opioids."[77] Summit asserts that the "distribution" of opioids "created the foreseeable opioid crisis and opioid public nuisance for which [it] seeks relief."[78]

### 3. Rite Aid's Alleged Pre-2015 Knowledge

Rite Aid allegedly "distribut[ed] far greater quantities of prescription opioids than [it] [knew] could be necessary for legitimate medical uses."[79] Summit contends that between 2010 and 2016, the average number of opioids "distributed" annually into Summit exceeded 67 per person, and based on this amount, Rite Aid was, or reasonably should have been "fully aware that the quantity of opioids being distributed . . . was untenable, and in many areas patently absurd."[80]

Summit also asserts that "from the catbird seat of [its] retail pharmacy operations," Rite Aid "knew or reasonably should have known about the disproportionate flow of opioids into

---

[74] Summit SAC ¶ 995; Summit TAC ¶ 996.
[75] Summit SAC ¶ 1; Summit TAC ¶ 1.
[76] Summit SAC ¶ 659; Summit TAC ¶ 658.
[77] Summit SAC ¶ 518; Summit TAC ¶ 518.
[78] Summit SAC ¶ 36; Summit TAC ¶ 58.
[79] Summit SAC ¶ 14; Summit TAC ¶ 14.
[80] Summit SAC ¶¶ 626, 689; Summit TAC ¶¶ 627, 690.

16

[Summit] and the operation of 'pill mills' that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion."[81] Summit specifically contended that "information was provided by news reports," including a 2011 article in the Columbus Dispatch titled 16 Charged in "Pill Mill" Pipeline.[82] Summit claims that "[i]n 2009, as a result of a multi-jurisdictional investigation by the DOJ, [Rite Aid] and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the [Controlled Substances Act]."[83] Summit states that the investigation revealed that "from 2004 onwards, [Rite Aid] pharmacies across the country had a pattern of non-compliance with the requirements of the [Controlled Substances Act] and federal regulations that [led] to the diversion of prescription opioids in and around the communities of the [Rite Aid] pharmacies investigated."[84]

## C. CHUBB'S DENIAL OF ITS COVERAGE AND DEFENSE OBLIGATIONS

Beginning with its July 23, 2018 letter, Chubb reserved its rights without making a coverage determination regarding the MDL Opioid Lawsuits and other Opioid Lawsuits.[85] In that letter, Chubb admitted that the "governmental plaintiffs claim they directly and foreseeably sustained economic damages related to provision of medical care for people of all ages, including infants born addicted to opioids, drug treatment, counseling and rehabilitation services, social services, childcare for children whose guardians are addicted, law enforcement, public safety, and morgues."[86] Chubb stated it had no "current" obligation to defend any Opioid Lawsuit but did not yet deny coverage.[87]

---

[81] Summit SAC ¶ 656; Summit TAC ¶ 657.
[82] Summit SAC ¶ 663 n.177; Summit TAC ¶ 664 n.178.
[83] Summit SAC ¶ 651; Summit TAC ¶ 652.
[84] Summit SAC ¶ 652; Summit TAC ¶ 653.
[85] Chima Aff., Ex. E.
[86] *Id.* at 2.
[87] *Id.* at 1; *accord* Chima Aff., Ex. F.

17

On October 9, 2018, Rite Aid advised Chubb that the applicable per occurrence Retained Limit had been satisfied by over $3,000,000 in defense cost payments."[88] Through a December 21, 2018 letter, notwithstanding its prior acknowledgements that the Opioid Lawsuits seek damages from Rite Aid for "medical care," "medical services," and operating "morgues," Chubb denied that it had an obligation to defend the Opioid Lawsuits brought by governmental entities and third-party payors of medical services.[89] Chubb now contends that those claimants did not suffer the underlying injuries themselves but only alleged "economic losses" for paying others' care.[90]

Following this letter, Chubb's subsequent correspondence adopted the positions taken in their previous letters, including the July 23, 2018 letter describing the Opioid Lawsuits and the December 21, 2018 coverage denial letter.[91]

## III. PARTIES' CONTENTIONS

### A. RITE AID'S MOTION

#### i. Rite Aid's Contentions

On April 16, 2019, Rite Aid filed its complaint. On July 19, 2019, with the other parties' consent, Rite Aid filed its amended and supplemental complaint. In the amended and supplemental complaint, Rite Aid asserts claims against ACE[92] for breach of contract (Count I), declaratory judgment on the duty to pay or reimburse defense costs (Count II), and for statutory remedies under 42 *Pa. Cons. Stat. Ann.* § 8371 for refusing to defend without good cause (Count III). Rite Aid brings this motion regarding Count II. Rite Aid's Motion was filed before the

---

[88] Chima Aff., Ex. G at 3.
[89] Chima Aff., Ex. E.
[90] *Id.*, Ex. H at 2–3.
[91] *Id.*, Exs. I–K.
[92] Although Chubb is handling the claims on behalf of numerous insurers, Rite Aid is moving for judgment against ACE on the 2015 Policy.

Amendments by Interlineation were made to the Third Amended Complaint, the negligence counts were dropped, and the Sixth Circuit's decision to strike the Amendments by Interlineation concerning dispensing claims.

In Rite Aid's Motion, Rite Aid states that it selected the 2015 Policy to cover its defense out of all the potentially applicable primary policies. Rite Aid argues that the Track One Lawsuits allege potentially covered claims because the injuries occurred during the Policy period, making Rite Aid's Defense Costs "Supplementary Payments." Rite Aid contends that ACE's denial of coverage under the Policy was without "good cause" because the Track One Lawsuits allege a claim for potentially covered damages "because of" "bodily injury." As such, ACE's defense coverage is implicated, and Rite Aid's payment of defense costs qualifies as "Supplementary Payments" under the Policy. Rite Aid claims that it satisfied the Policy's per occurrence retention for the Track One Lawsuits and all Opioid Lawsuits with these Supplementary Payments. Rite Aid explains the retention has been satisfied because: (i) the Track One Lawsuits and all Opioid Lawsuits that allege Rite Aid is liable as an opioid distributor arise out of a single occurrence; and (ii) Rite Aid's payment of defense costs for the MDL Lawsuits has exceeded the Policy's Retained Limit. Rite Aid argues that the Track One Lawsuits are one occurrence because the allegations concern one proximate, uninterrupted and continuing cause.

Accordingly, Rite Aid seeks declarations establishing that: (i) the Track One Lawsuits (and all Opioid Lawsuits alleging similar claims) are "potentially covered" by the Policy as required for a duty to defend; (ii) such suits are caused by one "occurrence"—the allegedly tortious distribution of opioids; (iii) Rite Aid's defense cost payments for such suits has satisfied the "per occurrence" Retained Limit; and thus (iv) ACE has a present obligation to pay or

19

reimburse defense costs ("Supplementary Payments") for the Track One Lawsuits and all Opioid Lawsuits alleging similar claims, which lasts "until such time [if ever] when it is determined that [each] claim [in the suits] is confined to a recovery that the policy does not cover," or until ACE pays the Policy's limits in judgments or settlements.

### ii. ACE's Contentions

ACE[93] argues that it has no duty to defend because of issues of material fact with respect to whether Rite Aid properly exhausted retention. ACE claims these issues of material fact include the number of occurrences, the reliability of Chima's affidavit, and the proper exhaustion of the retention. ACE further asserts that is has no duty to defend because prior to January 1, 2015, any alleged personal injury had already manifested, Rite Aid had knowledge of personal injury, and the opioid epidemic was a known loss or loss-in-progress. ACE contends that Rite Aid lacks the right to pick and choose a policy to provide coverage. ACE argues that this Court cannot rule on Rite Aid Motion with respect to other purportedly "similar" Opioid Lawsuits without identifying each one and explaining how these other Opioid Lawsuits are similar to the allegations and claims in the Counties' actions.

### iii. Great American Defendants' Contentions

In their response filed before the Amendments by Interlineation were stricken, the Great American Defendants argue that the Track One Lawsuits' pleadings as amended by interlineation in November 2019 do not arise out of one occurrence nor seek "damages because of personal injury." The Great American Defendants also argue that no "duty to indemnify" future settlements or judgments in the Opioid Lawsuits is at issue in the two pending motions.

### iv. Certain Excess Insurer Defendants' Contentions

---

[93] ACE issued the 2015 Policy. Chubb, however, is handling Rite Aid's claims relating to the MDL Opiate Lawsuits on numerous insurance policies.

20

In their response, Certain Excess Insurer Defendants request that any rulings on Rite Aid's Motion be narrowly and explicitly tailored to address only those matters at issue in that Motion. They contend that the Court need not make any determinations on issues that (i) relate to whether or not Rite Aid is entitled to a defense from any other excess insurer, or indemnity for any future settlement or judgment, in connection with any other MDL Opioid Lawsuit pending against Rite Aid or (ii) could implicate policies other than the single ACE policy at issue, such as the number of Occurrences, whether the future abatement costs sought by plaintiffs in connection with their nuisance claims are covered, or when the harm at issue in plaintiffs narrowed claims was first known to Rite Aid. Further, Rite Aid's Motion for partial summary judgment should be denied, according to Certain Excess Insurer Defendants, because there are issues of fact that can only be resolved after discovery.

**B. CHUBB'S MOTION**

### i. Chubb's Contentions

Chubb's Motion was filed when the operative complaint was the Third Amended Complaint as amended by the Amendments by Interlineation. For purposes of Chubb's Motion, all of the Chubb Policies at issue contain identical or materially similar terms.

Chubb's Motion seeks a declaration that Chubb has no obligation to provide coverage for the Track One Lawsuits on the grounds that those lawsuits do not seek "damages" "because of" or "for bodily injury" or "property damage." Chubb asserts that summary judgment is proper because the issue is one that involves a pure question of law, because there is no dispute that Cuyahoga and Summit are not seeking damages because of or for bodily injury, nor is there a dispute about the pertinent terms of the Chubb Policies. Chubb additionally argues that

21

Pennsylvania law governs and fully supports Chubb's position that there is no coverage for the *Summit* and *Cuyahoga* lawsuits.

### ii. Rite Aid's Contentions

Rite Aid contends that the Chubb Policies unambiguously cover liability claimed by governmental entities resulting from bodily injury to other persons. Rite Aid claims that Pennsylvania and Delaware law supports finding that the Track One Lawsuits seek "damages because of" bodily injury.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[94] On a motion for summary judgment, a movant must establish that the "undisputed facts support [its] claims or defenses," after which the burden "shifts to the non-moving party to demonstrate that there are material issues of fact to be resolved" at trial.[95] Where no such material facts exist, the moving party is entitled to judgment as a matter of law.[96]

## V. DISCUSSION

The principles governing the interpretation of an insurance contract are well-settled. In attempting to resolve a dispute over the proper interpretation of an insurance policy, "a court should first seek to determine the parties' intent from the language of the insurance contract itself."[97] In reviewing the terms of an insurance policy, the Court considers "the reasonable

---

[94] Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).
[95] *Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, at *3 (Del. Super. June 23, 2015).
[96] *Id.*
[97] *Alstrin v. St. Paul Mercury Ins. Co.,* 179 F. Supp. 2d 376, 388 (D. Del. 2002); *see also Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del. 1997) ("The scope of an insurance policy's coverage . . . is prescribed by the language of the policy.") (citing *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992)); *Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076–77 (Del. Super. 1992) (citing *E.I. du Pont de Nemours v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)); *Kaiser Alum. Corp. v. Matheson,* 681 A.2d 392, 395 (Del. 1996).

22

expectations of the insured at the time of entering into the contract to see if the policy terms are ambiguous or conflicting, contain a hidden trap or pitfall, or if the fine print takes away that which has been provided by the large print."[98]  Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[99]  Absent any ambiguity, contract terms should be accorded their plain, ordinary meaning.[100]

If an insurance policy contains an ambiguous term, then the policy is to be construed in favor of the insured to further the contract's purpose and against the insurer, as the insurer drafts the policy and controls coverage.[101]  An "insurer has an obligation to defend its insured, even if the action against the insured is groundless, whenever the complaint . . . may potentially come within the coverage of the policy."[102]  As long as the complaint "'might or might not' fall within . . . coverage, the [insurer] is obliged to defend."[103]  Although the Court looks to the allegations of the underlying Counterclaim, the Court is not "limited to the plaintiff's unilateral

---

[98] *See E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1996 WL 111205, at *2 (Del. Super. Jan. 30, 1996); *see also Steigler v. Ins. Co. of N. Am.,* 384 A.2d 398, 401 (Del. 1978) ("[A]n insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit.") (quoting *State Farm Mutual Auto. Ins. Co. v. Johnson,* 320 A.2d 345 (Del. 1974)).

[99] *Id.*

[100] *Alta Berkeley VIC. V. v. Omneon, Inc.,* 41 A.3d 381, 385 (Del. 2012); *see also Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Nov. 30, 2018); *IDT Corp. v. U.S. Specialty Ins. Co.,* 2019 WL 413692, at *7 (Del. Super. Jan. 31, 2019).

[101] *See Alstrin*, 179 F. Supp. 2d at 390 ("Generally speaking, however, Delaware . . . courts continue to strictly construe ambiguities within insurance contracts against the insurer and in favor of the insured in situations where the insurer drafted the language that is being interpreted regardless of whether the insured is a large sophisticated company."); *Rhone–Poulenc Basic Chems. Co*., 1992 WL 22690, at *8 ("Application of the [*contra proferentem*] doctrine turns not on the size or sophistication of the insured, but rather on the fact that the policy language at issue is drafted by the insurer and is not negotiated."); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John,* 630 Pa. 1, 23, 106 A.3d 1, 14 (2014).

[102] *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 321–22 (Pa. 1963).

[103] *Jerry's Sport Center*, 2 A.3d at 541 (citation omitted); *see also Stidham v. Millvale Sportsmen's Club*, 618 A.2d 945, 953–54 (Pa. Super. Ct. 1993) ("If coverage depends upon the existence or nonexistence of undetermined facts outside the complaint, until the claim is narrowed to one patently outside the policy coverage, the insurer has a duty to defend….") (citations omitted); *DecisionOne Corporation v. ITT Hartford Ins. Group*, 942 F. Supp. 1038, 1042 & 1044 (E.D. Pa. 1996) ("If a single claim in a multi-claim lawsuit has potential for coverage, the insurer must defend all claims until it is obvious that no possibility of recovery exists as to claims within the policy provisions.").

characterization of the nature of [its] claims."[104]  The Court considers "all reasonable inferences that may be drawn from the alleged facts."[105]  The Court then determines "whether the allegations of the complaint, when read as a whole, assert 'a risk within the coverage of the policy.'"[106]

Under the Policy, Chubb has a "duty to defend" suits "seeking" damages to which the Policy applies by paying "expenses" "incur[red]" in the defense of such suits.[107]  Chubb's duty to defend and its other coverage obligations are subject to Rite Aid first paying $3,000,000 in "Supplementary Payments" caused by one occurrence.[108]  Both Rite Aid's and Chubb's Motions ask the Court to resolve whether Rite Aid's payment of over $3,000,000 in defense costs for the MDL Lawsuits since May 2018 constitute "Supplementary Payments" that satisfied the Policy's Retained Limit, triggering ACE's duty to defend and pay "Supplementary Payments."

To arrive at its decision, the Court must determine whether the complaints in the Track One Lawsuits allege claims that (i) seek damages potentially within the scope of the Policy's coverage, and (ii) arise out of a single occurrence.

A. PENNSYLVANIA OR DELAWARE LAW GOVERNS THE POLICIES.

In contract interpretation disputes, absent a choice of law provision, Delaware courts apply the law of the state that "has the most significant interest in applying its law to the

---

[104] *Verizon Commc'ns Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118, at *6 (Del. Super. Ct. Mar. 2, 2017), *rev'd and remanded sub nom. In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019) (finding that the same law applies in Delaware and New York regarding the duty to defend and to advance defense expenses); *IDT Corp*, 2019 WL 413692, at *10.

[105] *See Blue Hen Mech., Inc. v. Atl. States Ins. Co.,* 2011 WL 1598575, at *2 (Del. Super. Apr. 21, 2011) ("The Court may review the complaint as a whole, considering all reasonable inferences that may be drawn from the alleged facts."), *aff'd,* 29 A.3d 245 (Del. 2011).

[106] *Verizon Commc'ns*, 2017 WL 1149118, at *7 (citing *Cont'l Cas. Co. v. Alexis I. DuPont Sch. Dist.,* 317 A.2d 101, 103 (Del. 1974).

[107] Chima Aff., Ex. A at RA0002519, RA0002525.

[108] Chima Aff., Ex. A at RA0002572; *see also* Chima Aff., Ex. B at RA0002791 (ACE P&C 2015 umbrella policy stating "Defense costs are included in the limit" of underlying Self-Insured Retention).

24

interpretation of the insurance scheme and its terms as a whole in a consistent and durable manner that the parties can rely on."[109]  Delaware and Pennsylvania each have significant interests in this contract interpretation dispute.  Delaware is Rite Aid Corporation's state of incorporation and this forum's location, while Pennsylvania is the place of the contracting, the place of contract performance, Rite Aid's and ACE's principal place of business, and ACE's state of incorporation.[110]

Although both states have significant interests, the Court does not need (at this stage of the litigation) make a determination as to which state's law applies to the Policy.  The Court notes that Pennsylvania and Delaware law do not conflict or are materially different with respect to the Motions' relevant issues.[111]  As such, the Court may consider both states' shared legal principles to resolve the Motions.

**B. THE PLAINTIFFS IN THE TRACK ONE LAWSUITS SEEK DAMAGES "BECAUSE OF BODILY INJURY."**

The Policy covers "sums" that Rite Aid "becomes legally obligated to pay as damages *because of* 'personal injury'…."[112]  "Personal injury" includes "bodily injury," which in turn means "means bodily injury, sickness or disease sustained by a person, including death resulting

---

[109] *See Certain Underwriters at Lloyd's London v. Chemtura Corp.*, 160 A.3d 457, 460 (Del. 2017) (applying Restatement (Second) of Conflict of Laws Section 188 factors to determine the state with most significant interest in insurance contract dispute). The Section 188 factors are: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See id.* at 465.

[110] *See* Chima Aff., Ex. A at RA0002512 ("ACE American Insurance Company[,] 436 Walnut Street Philadelphia, PA 19106-3703 . . . **NAMED INSURED**[,] Rite Aid Corporation 30 Hunter Lane Camp Hill PA 17011); *id.* at RA0002518 ("By signing and delivering the policy to you, we state that it is a valid contract . . . **ACE AMERICAN INSURANCE COMPANY**. . . 436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703); Ex. E (July 23, 2018 letter from Chubb LTE Claims, Scranton, Pennsylvania); Ex. G (October 9, 2018 letter from Rite Aid Corporation, Camp Hill, Pennsylvania); Ex. V ¶¶ 5–6, 9–10, 12, 50, 52–53.

[111] *See Valley Forge Ins. Co. v. Nat'l Union Fire Ins. Co.*, 2012 WL 1432524, at *6–9 (Del. Super. Mar. 16, 2012) (applying Delaware law to determine number of occurrences because Delaware applies "substantially the same 'cause' test" as Pennsylvania and Massachusetts); *Smith*, 201 A.3d at 560–61 (reciting Delaware's "potential" for coverage standard for duty to defend); *Jerry's Sport Ctr.*, 2 A.3d at 541–543 (same under Pennsylvania law).

[112] Chima Aff., Ex. A at RA0002519.

from any of these at any time."[113]  The parties do not dispute that physical harm from opioid addiction constitutes "bodily injury" under the Policy.  The dispute centers on whether plaintiffs in the Track One Lawsuits were the ones that suffered the injury.  Chubb argues that because plaintiffs in the underlying Track One Lawsuits are not the individuals who suffered from opioid addiction, plaintiffs are not seeking damages "because of bodily injury," but rather are "instead are "seek[ing] to recover solely economic losses."[114]

As alleged, Summit and Cuyahoga claim these damages as their own "unique harms" and disavow asserting claims "derivative of others."[115]  Summit and Cuyahoga "seek all legal and equitable relief as allowed by law" for their significant health, emergency, and other expenses "as a direct and proximate result" of such persons' opioid-related injuries or deaths.[116]  Although Summit and Cuyahoga in the Track One Lawsuits distinguish their own "economic damages" from harms and damages of injured Ohioans, they do not disavow that the harms and injuries caused the economic damages.[117]

Indeed, Summit and Cuyahoga only make the distinction that their claims purportedly are not "product liability claim[s]" on behalf of citizens that sustained opioid-related injuries or death.  As represented by the parties, this is likely due to the Ohio Product Liability Act ("OPLA") which abrogates "product liability claims."[118]  In the Track One Lawsuits, the MDL District Court Judge ruled that the plaintiffs' public nuisance claims are not "product liability" claims, relying on a distinction between (i) claims seeking compensatory damages for "harm,"

---

[113] *Id*. at RA0002532, RA0002535.
[114] Chima Aff., Ex. H at 2–3.
[115] Konkel Decl., Ex. D ¶¶ 138–139, 144; Ex. E ¶¶ 153–154, 159.
[116] Konkel Decl., Ex. D ¶¶ 113, 131, 145; Ex. E ¶¶ 127, 146, 160.
[117] *See In re: Nat'l Prescription Opiate Litig*., 2018 WL 6628898, at *12 (N.D. Ohio Dec. 19, 2018) ("MDL Order").
[118] *Id*.; Konkel Decl., Ex. D ¶¶ 138–139, 144; Ex. E. ¶¶ 153–154, 159.

26

which OPLA abrogates, and (ii) claims seeking solely "economic loss," which OPLA does not abrogate.[119]

OPLA provides that "harm" includes "death [and] physical injury to person," and "[e]conomic loss is not 'harm.'"[120] OPLA, however, does not abrogate all claims "as a result of" such "death" or "physical injury." By definition, such "economic loss" encompasses:

> All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations incurred as a result of an injury, death, or loss to person that is a subject of a tort action . . . [and] [a]ny other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a tort action . . . .[121]

Although the MDL District Court Judge ruled that the Track One Lawsuits plaintiffs' public nuisance claims do not seek damages for what OPLA defines as "harm," the MDL District Court Judge did hold that the defendants remained at least liable for "economic loss" which, by definition, includes "direct, incidental, or consequential pecuniary loss" apart from the initial "harm" itself.[122] OPLA thus only abrogates claims seeking compensatory damages directly for one's "death" or "physical injury."

The parties have identified a number of insurance coverage cases arising out of similar issues presented in the Motions. The Court first addresses in *Medmarc Casualty Insurance Co. v. Avent America Inc.*[123] In *Medmarc*, the Seventh Circuit considered the plaintiff insurance company's duty to defend under Illinois law in relation to a suit against the defendant, a manufacturer of baby bottles and other accessories that had been sued regarding possible toxic contamination of those products.[124] The insurance policy at issue in *Medmarc* provided that the

---

[119] MDL Order at *14.
[120] Ohio Rev. Code Ann. § 2307.71(A)(7).
[121] Ohio Rev. Code Ann. § 2307.011(C); *see In re: Nat'l Prescription Opiate Litig.*, 2019 WL 4194272, at *3 n.5 (N.D. Ohio Sept. 4, 2019) (quoting same).
[122] Ohio Rev. Code Ann. § 2307.71(A)(2).
[123] 612 F.3d 607 (7th Cir. 2010).
[124] *Id*.

insurer would cover damages "because of bodily injury."[125]  There was no claim of bodily injury as a result of the insured's conduct in the underlying lawsuit.[126]  Rather, the manufacturer contended that allegations in the underlying lawsuits that plaintiffs would not use the products out of fear of bodily injury was sufficient to allege a claim for damages "because of bodily injury," pursuant to the insurance policies.[127]  As such, the court found that the plaintiffs sustained purely economic damages unrelated to bodily injury.[128]

This Court recognizes a critical distinction between the plaintiffs of the underlying lawsuit in *Medmarc* and the governmental entities in the Track One Lawsuits.  The *Medmarc* plaintiffs alleged they bought "dangerous" but "unusable products" that never actually injured their children.[129]  In the Track One Lawsuits, however, plaintiffs allege their citizens used opioids, their citizens were extensively injured by such usage and, therefore, plaintiffs suffered their own damages for handling emergency responses to overdoses, providing addiction treatment, holding opioid related investigations, arrests and alike.[130]

The application of *Medmarc* was further expanded in *Cincinnati Ins. Co. v. Richie Enterprises LLC*.[131]  In *Richie*, the district court considered whether an opioid distributor was entitled to coverage under a policy that covered damages "because of bodily injury."[132]  The insured in *Richie* argued that West Virginia, the governmental plaintiff, "should be deemed an organization seeking damages 'because of bodily injury' because of the opioid epidemic."[133]

---

[125] *Id*. at 608.
[126] *Id*.
[127] *Id*.
[128] *Id*.
[129] *Id*.
[130] Summit TAC ¶¶ 2–24; Cuyahoga TAC ¶¶ 2–23; Cuyahoga SAC ¶¶ 2–23; Ex. P ¶ 2–23.
[131] 2014 WL 3513211, *3–5 (W.D. Ky. 2014).
[132] *Id*. at *5–6.
[133] *Id*. at *6.

The *Richie* court disagreed and held that West Virginia was seeking damages solely for economic loss.[134]

The *Richie* court explained there was an important distinction between an organization seeking damages "because of" a citizen's bodily injury versus damages due to a defendant's "alleged distribution of drugs in excess of legitimate medical need."[135]  The *Richie* court reasoned that West Virginia did not need to prove "bodily injury" to establish that the distributors violated the statutes, caused a public nuisance, or were negligent in their distribution of controlled substances.  The *Richie* court held that West Virginia "is not seeking damages 'because of' the citizens' bodily injury; rather, it is seeking damages because it has been required to incur costs due to drug distribution companies' alleged distribution of drugs in excess of legitimate medical need."[136]  Importantly, West Virginia had dropped a medical monitoring claim when it amended its complaint.[137] The *Richie* court found that, in the absence of the medical monitoring claim, there was no duty to defend because the insured was not potentially responsible for a covered claim.[138]

*Travelers Property Casualty Co. v. Anda* also analyzes the insurance policy of a different pharmaceutical drug company sued in the same underlying complaint in *Richie*.[139]  Relying upon the *Richie* court's analysis in part, the *Anda* court found no coverage for the defense costs incurred in the opioid lawsuits.[140]  The *Anda* court explained that the underlying plaintiffs did not "assert claims on behalf of individual citizens for the physical harm sustained personally by those citizens" and that "[a]ny reference to the drug abuse and physical harm to West Virginia

---

[134] *Id*. at *5.
[135] *Id*. at *6.
[136] *Id*.
[137] *Id*. at *2, *5.
[138] *Id*. at *5–6.
[139] 90 F. Supp.3d 1308, 1314–1315 (S.D. Fla. 2015), *aff'd*, 658 Fed. Appx. 955 (11th Cir. 2016).
[140] *Id*.

29

citizens merely provides context explaining the economic loss to the state."[141]  Further, on appeal, the Eleventh Circuit "decline[d] to reach" the "damages because of bodily injury" issue and held that "the better conclusion" is that a "Products Exclusion" barred coverage.[142]

Unlike in *Richie* and *Anda*, Delaware and Pennsylvania courts recognize that the duty to defend test extends past the mere labels of a claim, inquiring into whether the factual allegations in the underlying complaint potentially support a covered claim.[143]  These courts generally acknowledge that the duty to defend arises whenever the underlying complaint alleges facts that fall within the scope of coverage and construe this duty broadly in favor of the policyholder.[144] It is undisputed that the Track One Lawsuits allege in fact that there was physical harm from opioid addiction and that such harm constitutes bodily injury under the Policy.[145]

Although the Eleventh Circuit in *Anda* did not directly address the scope of the phrase "damages because of bodily injury," several courts since have interpreted the phrase broadly as it relates to insurance policies and have declined to apply the reasoning in *Richie*.  For instance, the Seventh Circuit opted for a broader interpretation of the phrase in *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*[146]  In *H.D. Smith*, the plaintiff sought coverage for defense costs incurred in the underlying action brought against it by West Virginia for the cost of care for its drug-addicted citizens.[147]  The policy defined "damages because of bodily injury" as including "damages claimed by any person or organization for care, loss of services or death resulting at any time

---

[141] *Id.*
[142] *See* 658 Fed. App'x 955, 958 (11th Cir. 2016).
[143] *Verizon Commc'ns*, 2017 WL 1149118, at *6; *IDT*, 2019 WL 413692, at *10; *D'Auria v. Zurich Ins. Co.*, 352 Pa. Super. 231, 234, 507 A.2d 857, 859 (1986).
[144] *Verizon Commc'ns*, 2017 WL 1149118, at *6; *AR Capital, LLC v. Xl Specialty Ins. Co.*, 2018 WL 6601184, at *8 (Del. Super. Dec. 12, 2018) ; *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 217, 903 A.2d 1170, 1177 (2006); *Kurach v. Truck Ins. Exch.*, 2020 WL 4760092, at *8 (Pa. Aug. 18, 2020); *Gen. Acc. Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (1997).
[145] Summit TAC ¶¶ 2–24; Cuyahoga TAC ¶¶ 2–23; Cuyahoga SAC ¶¶ 2–23; Ex. P ¶ 2–23.
[146] 829 F.3d 771, 773 (7th Cir. 2016).
[147] *Id.*

from the bodily injury."[148] This definition is substantially the same as the definition provided in Chubb's Policy.[149]

Chubb's interpretation of the Policy is similar to the insurer's interpretation of its insurance policy in *H.D. Smith*. In that underlying complaint, West Virginia alleged that it "incurred 'excessive costs related to diagnosis, treatment and cure of addiction,' and has 'provide[d] necessary medical care, facilities, and services for treatment of citizens' who cannot afford their own care."[150] The insurer advanced an argument that West Virginia was seeking its own damages, not damages on behalf of its citizens, in its suit against a pharmaceutical company for money spent addressing the opioid epidemic.[151] The *H.D. Smith* court responded "[b]ut so what?" to the insurer's argument.[152] Based on the same policy language as in the 2015 Policy, the insurer conceded that its policy would cover a mother's cost of "care" for her son's opioid-related injuries, though those are "her own" damages. As the *H.D. Smith* court observed, under the policy language, "the result is no different merely because the plaintiff is a state, instead of a mother."[153]

The *H.D. Smith* court also noted that West Virginia sought "reimbursement for such 'damages and losses sustained as a proximate result' of [the insured's] negligence."[154] In other words, under the plain meaning of the policy, coverage depends on the causal connection between those damages and "bodily injury" or "property damage."[155] Accordingly, the *H.D. Smith* court held that "because of bodily injury" included claims brought by West Virginia to

---

[148] *Id.*
[149] *See* Chima Aff., Ex. A.
[150] *H.D. Smith*, 829 F.3d at 775.
[151] *Id*. at 774.
[152] *Id*.
[153] *Id*.
[154] *Id*. at 775.
[155] *See id*.

recover damages sustained due to the opioid epidemic, and so that insurer had a duty to defend against the underlying suit.[156]  Although the *H.D. Smith* court applied Illinois law, this reasoning comports with the principles of Delaware and Pennsylvania law.

The Ohio First District Court of Appeals' recent decision in *Acuity v. Masters Pharmaceutical Inc.* provides additional guidance supporting this Court's application of *H.D. Smith*.[157]  Initially, the trial court determined as a matter of law that the counties did not seek "damages because of bodily injury" from the pharmaceutical wholesale distributor.[158]  Rather, the trial court found that the governmental entities lacked standing and could not "usurp citizens' right to recover their "damages because of bodily injury."[159]  On appeal, the *Acuity* court reversed, declining to follow the reasoning in *Richie* due to its reliance on *Medmarc* and found the reasoning in *H.D. Smith* persuasive.[160]  The *Acuity* court explained "that there is arguably a causal connection between [the insured pharmaceutical wholesale distributor's] alleged conduct and the bodily injury suffered by individuals who became addicted to opioids, overdosed, or died, and the damages suffered by the governmental entities (money spent on services like emergency, medical care, and substance-abuse treatment)."[161]  Although the governmental entities were seeking their own economic losses, the *Acuity* court found that some of those losses were arguably because of bodily injury.[162]

The Court agrees with the reasoning set out in *Acuity* and *H.D. Smith*.  The decisions in *Richie* and *Medmarc* either view the alleged facts too narrowly or do not involve claims similar

---

[156] *Id.*
[157] 2020 WL 3446652 (Ohio Ct. App. June 24, 2020).
[158] *Acuity v. Masters Pharm., Inc.*, No. A1701985 (Ohio C.P. 2019), attached as Keopff Decl., Ex. R (hereinafter, *Acuity*, Court of Common Pleas Decision), at 3–6.
[159] *Id.* at 5.
[160] *Acuity*, 2020 WL 3446652, ¶ 24.
[161] *Id.* ¶ 28.
[162] *Id.* ¶ 29.

to those asserted in the Track One Lawsuits.  The Court has analyzed the allegations in the Track One Lawsuits and finds that some of the economic losses sought by the governmental entities are arguably because of bodily injury.  Construing this duty to defend "broadly in favor of the policyholder," the Court finds that the Track One Lawsuits and all Opioid Lawsuits alleging similar claims are potentially covered under the Policy, triggering ACE's duty to defend.

## C. THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT BECAUSE THE TRACK ONE LAWSUITS AND SIMILAR OPIOID LAWSUITS ALLEGE ONE OCCURRENCE.

Rite Aid argues that it properly satisfied the per occurrence retention.  Rite Aid asserts that the Track One Lawsuits and all "similar" Opioid Lawsuits arise from one occurrence, which is described as only "the tortious distribution of opioids."[163]  Chubb disagrees and contends that the Track One Lawsuits plead that there were two separate occurrences created when the Amendments by Interlineation included allegations regarding the disbursement of opioids: an occurrence for distribution and an occurrence for dispensing.

As set forth above, the Sixth Circuit struck the Amendments by Interlineation.  The Court finds that this moots the multiple occurrence argument and there is no dispute that the claims in the Track One Lawsuits arise from one occurrence.  Moreover, no *genuine* dispute exists on whether Rite Aid has paid more than $3,000,000 in defense costs in the Track One Lawsuits. The Policy has a $3,000,000 "Retained Limit" that is "the most an insured will pay for … [d]amages and Supplementary Payments under Coverage A because of all 'personal injury' … arising out of any one occurrence." [164]  Thus, the retention is satisfied.

The remaining dispute is whether the Track One Lawsuits and all "similar" lawsuits alleging "tortious distribution and/or dispensing of opioids" arise from a single occurrence.  Rite

---

[163] Chima Aff. ¶ 31.
[164] Chima Aff., Ex. A. at RA0002572.

Aid argues that ACE must defend each Opioid Lawsuit alleging similar and/or consistent claims to the Track One Lawsuits. For purposes of similar litigation where dispensing claims are alleged, is still relevant to determine if dispensing and distribution claims would be considered the same occurrence. Indeed, the MDL District Court Judge noted that "dispensing-related claims are at issue in many of the nearly 2,500 cases in the MDL."[165]

Rite Aid explains that distribution and dispensing should be one occurrence where it involves the "movement of opioid products from (for example) a warehouse to a specific pharmacy, while 'dispensing' refers to the 'final step' in the distribution process, from the pharmacy to an individual patient." Chubb contends that there are separate causes present that could result in economic loss. For example, Summit contended Rite Aid's misconduct as a distributor included: (i) Rite Aid's participation in industry organizations that worked with "Marketing Defendants" (the manufacturers) to devise methods of deceptive advertising;[166] (ii) Rite Aid's failure to control the supply chain;[167] (iii) Rite Aid's failure to "prevent diversion";[168] (iv) Rite Aid's failure to "report suspicious" orders;[169] and (v) Rite Aid's failure to halt shipments of opioids in quantities it "knew . . . could not be justified and were indicative of serious problems of overuse of opioids."[170] Chubb contends that each of these activities could result in a separate "cause" of the Counties' economic losses.

Chubb also contends that the arguments by Rite Aid reveal that the dispensing and distribution claims are separate causes. As argued by Rite Aid in the MDL Opioid Lawsuits,

---

[165] Opioid MDL (Nov. 19, 2019) ECF No. 2940 pp. 2–3.
[166] *E.g.*, Summit TAC ¶¶ 534, 545.
[167] *Id*. at ¶¶ 518, 580.
[168] *Id*. at ¶¶ 101, 518.
[169] *Id*. at ¶ 518.
[170] *See, e.g.*, Summit SAC ¶¶ 518, 534–35; Summit TAC ¶¶ 518, 534–35.

there are significant differences between the distribution and the dispensing of prescription opioids:

- "Plaintiffs' new [dispensing] claims target the conduct of completely different corporate functions and employees . . . are based on entirely different legal duties."[171]

- "While Plaintiffs' distribution claims focused on a handful of distribution centers, their proposed dispensing claims implicate the work of hundreds of pharmacists at dozens of locations filling innumerable prescriptions written by doctors across the region for any number of patients."[172]

- Rite Aid pointed out to the Sixth Circuit that "[p]rescriptions filled in Honolulu are irrelevant in Houston. . . . Dispensing related claims are inherently jurisdiction-specific, as they concern particular prescriptions in particular states and can implicate state-specific statutes and legal principles." Opioid MDL (Jan. 17, 2020) ECF No. 3084-1 pp. 24-25. This is exactly the point ACE is making with respect to the dispensing claims. "Plaintiffs previously asserted claims against the Pharmacy Defendants only for the conduct of their distribution centers in monitoring orders placed by their own pharmacies."[173]

- "Plaintiffs' proposed new claims, in contrast, challenge the conduct of the individual pharmacists employed by the Pharmacy Defendants in filling individual prescriptions . . . on behalf of individual patients."[174]

- "These are new and different claims in every possible respect – including as a matter of the governing legal obligations and facts at issue. The regulatory provisions applicable to the new claims are entirely different."[175]

Chubb misconstrues the cause test. Under Pennsylvania law, in order for there to be one occurrence, there must be "one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage."[176] Furthermore, the Policy defines "Occurrence" to mean "[w]ith respect to injury within subparagraph a. of the definition of 'personal injury' (that is,

---

[171] ACE's Opp. at 16 (citing Rite Aid Opposition to Motion to Amend at 2).
[172] *Id.* at 16–17 (citing Rite Aid Opposition to Motion to Amend at 6).
[173] *Id.* at 17 (citing Rite Aid Opposition to Motion to Amend at 5).
[174] *Id.*
[175] *Id.*
[176] *Sunoco, Inc. v. Illinois Nat. Ins. Co.,* 226 Fed. Appx. 104, 107 (3d Cir. 2007).

'bodily injury') or 'property damage,' an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[177]  Under this cause test, there can be multiple instances that constitute a single cause.  Two District Court for the District of Nevada cases—*Insurance Company of the State of Pennsylvania v. National Fire & Marine Insurance Co.*[178] and *Century Surety Co. v. Casino West, Inc.*[179]— aptly demonstrate this important distinction concerning independent causes in applying the cause test.

The *National Fire* court considered whether independent defects in the structural components and electrical and plumbing systems of a condominium building constituted multiple occurrences such that the primary insurance provider's aggregate limit applied to the damage.[180]  The *National Fire* court held that the various causes constituted multiple occurrences under the insurance policy because the expert reports identified independent defects in the structure, electrical system, and plumbing system, "all of which independently caused damages."[181]  The defects in question each contributed some degree of damage that was identifiable and measurable.[182]  The defects in the roof led to water intrusion resulting in damage to the substrates and building interiors, the defects in the electrical installations resulted in faulty wiring and code violations, and the faulty plumbing led to the improper installation of toilets, bathtubs, and showers.[183]  The court concluded that the alleged damage could not be attributed to "one common cause."[184]

---

[177] Koepff Decl. Ex. J at RA0002519–2520.
[178] 2012 WL 4482674 (D. Nev. Sept. 26, 2012).
[179] 99 F. Supp. 3d 1262, 1266 (D. Nev. 2015).
[180] *National Fire*, 2012 WL 4482674, at *3.
[181] *Id*. at *4.
[182] *Id*.
[183] *Id*.
[184] *Id*.

Unlike the damages in *National Fire* that arose from independent causes, *Century Surety Co.* presented one common cause of the victims' deaths—carbon monoxide poisoning.[185] The fact that the fatal conditions in this case were the result of more than one contributing cause does not undermine that conclusion. Unlike the structural, electrical, and plumbing issues discussed in *National Fire* that each produced a separate harm, the various causes of the carbon monoxide identified in *Century Surety Co.* did not result in damage independent and apart from one another.[186] On the contrary, the faulty heater, the missing ventilation, and the sealed vents together produced the fatal conditions.[187] Had even one of these elements been absent, there is no evidence that lethal levels of carbon monoxide would have spilled into the victims' room.[188]

Similarly, the over distribution and improper dispensing produced injuries to opioid users, the costs of which ultimately fell upon the government. There is no evidence that the opioids could have caused the personal injuries alleged in the complaint had there not been both the improper distribution and dispensing of the opioids. It is not possible to identify independent damages from each respective cause of distribution and dispensing. Thus, the distribution and dispensing claims should be deemed to be one occurrence under the policy. This finding is consistent with Pennsylvania law. The Pennsylvania Supreme Court in *Donegal Mutual Insurance Co. v. Baumhammers* held that when an insured's alleged liability is premised on alleged negligent inaction or inadequate action that permits others' intervening conduct resulting in harm, liability arises from one occurrence.[189] Specifically the court found:

> Parents liability . . . is premised on their negligence in failing to confiscate Baumhammers' weapon and/or notify law enforcement or Baumhammers' mental health care providers of his unstable condition. Because coverage is predicated on

---

[185] *Century Sur. Co.*, 99 F. Supp. 3d at 1266.
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] 938 A.2d 286, 295 (Pa. 2007).

Parents' inaction, and the resulting injuries to the several victims stem from that one cause, we hold that Parents' alleged single act of negligence constitutes one accident and one occurrence.[190]

Because the injuries alleged resulted from the inadequate action in both the distribution and dispensing stages, whereby if there had been proper controls in place in either stage the injury could have been prevented, the alleged act should constitute one occurrence.

## D. ACE HAS A DUTY TO DEFEND THE TRACK ONE LAWSUITS UNDER THE "MULTIPLE TRIGGER" THEORY.

ACE argues in its Opposition that it does not have a duty to defend because any alleged personal injury first manifested prior to 2015. ACE argues that under Pennsylvania law, the only potentially applicable policy is the policy in effect when the injurious effects of an alleged occurrence first manifest themselves to the Counties. The Court disagrees with this characterization of Pennsylvania law. The Court reads Pennsylvania law to provide certain exceptions in latent injury cases. In a case relied upon by ACE, *Pennsylvania National Mutual Casualty Ins. Co. v. St. John,*[191] the Supreme Court of Pennsylvania quoted the Pennsylvania Superior Court in *Consulting Engineers, Inc. v. Ins. Co. of North Amer*ican[192] to determine where the "multiple trigger theory" should apply and where the "single trigger theory" should apply. The Superior Court in *Consulting Engineers* stated, in relevant part:

> The "multiple trigger" theory is applied in latent disease cases, like asbestosis or mesothelioma, because such injuries may not manifest themselves until a considerable time after the initial exposure causing injury occurs. The overriding concern in latent disease cases is that application of the *D'Auria* "first manifestation" rule would allow insurance companies to terminate coverage during the long latency period (of asbestosis); effectively shifting the burden of future claims away from the insurer to the insured (manufacturers of asbestos), even though the exposure causing injury occurred during periods of insurance coverage.

---

[190] *Id*. at 288–89.
[191] 106 A.3d 1, 15–23 (Pa. 2014).
[192] 710 A.2d 82, 87–88 (Pa. Super. 1998).

Based upon this reasoning, the Superior Court declined to apply the multiple trigger theory to determine coverage under various policies of CGL insurance for injuries arising from the wrongful use of civil proceedings, as these injuries did not lie dormant for extended periods prior to manifesting.[193]

The Supreme Court of Pennsylvania then distinguished the latent injury circumstances of

*Consulting Engineers* from the facts in *St. John*:

The justification advanced in [ ] *Consulting Engineers* for utilizing the multiple trigger theory is absent with respect to Appellants' action seeking coverage under the Penn National policies. Here, the damage sustained by Appellants' dairy herd, occasioned by LPH Plumbing's negligent installation of the plumbing system, did not lay dormant for an extended period. The record indicates that damage to Appellants' dairy herd first manifested in April 2004, less than a year after the dairy herd first began ingesting the contaminated drinking water. Moreover, unlike asbestos bodily injury claims which insurers could predict with near certainty, there was no indication of probable injury to Appellants' dairy herd prior to manifestation that would cause Penn National to anticipate a future claim. Accordingly, this case does not present the problematic scenario where a risk averse insurer takes steps to limit or terminate coverage, in anticipation of future claims that have not yet materialized but can be predicted with near certainty.[194]

The personal injury of opioid abuse and opioid used disorder would plainly fall into the category of a "latent injury" because, similar to asbestosis or mesothelioma, "such injuries may not manifest themselves until a considerable time after the initial exposure causing injury occurs."[195] The record also does not indicate when the injury first manifested.

Even under ACE's "first manifestation" trigger theory, the complaints do not establish when any one or all persons' alleged bodily injury caused by Rite Aid occurred. ACE must defend a "suit" if even one claim seeks potentially covered damages. The Policy's coverage "applies" to "bodily injury" that is "sustained by a person" during the policy period that also is "caused by" an "occurrence."[196] Because some of the alleged bodily injuries to "person[s]"

---

[193] *Id*.
[194] *St. John*, 106 A.3d at 23.
[195] *Consulting Engineers*, 710 A.2d at 87–88.
[196] *See id*. Chima Decl., Ex. A at RA0002519–RA0002532.

"caused" by Rite Aid potentially took place during 2015, ACE has a duty to defend under the Policy.

**E. ACE'S PRIOR KNOWLEDGE AND KNOWN LOSS/LOSS-IN-PROGRESS DEFENSES ALSO FAIL.**

ACE raises two separate defenses related to Rite Aid's knowledge. First, the 2015 Policy includes a "prior knowledge" provision, which is not an exclusion, but rather a prerequisite to establishing coverage.[197] The provision states, in relevant part:

> This insurance applies to "personal injury" and "property damage" only if . . . [p]rior to the policy period, no insured . . . knew that the "personal injury" or "property damage" had occurred, in whole or in part.[198]

ACE contends that it has no duty to defend under this "prior knowledge" provision.

Second, in addition to ACE's "prior knowledge" defense, there is a separate and distinct defense under Pennsylvania law providing that an insurer has no obligation to defend (or indemnify) a known loss/loss-in-progress that exists prior to a policy's inception date (the "known loss doctrine").[199] ACE argues there was also "a known loss/loss-in-progress with respect to opioids" before 2015 and therefore it owes no defense obligations.[200] This "known loss" ACE contends existed "was the opioid epidemic that started in the early 2000s . . . ."[201]

In the *Acuity* case relied on by ACE, the Ohio trial court had originally granted summary judgment on the ground that the insurer had no duty to defend or indemnify based on the "loss-in-progress" provision of the insurance policy.[202] This provision stated in relevant part:

---

[197] *Id.* at RA0002519.
[198] *Id.*
[199] *See, e.g., Rohm & Haas Co. v. Cont'l Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001) (the known loss doctrine precludes an insured from insuring against a loss that has already occurred or is ongoing); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982) (a "contrary result . . . would contravene the rule that an insured cannot insure against something which has already begun").
[200] ACE's Opp. at 30.
[201] *Id.*
[202] *Acuity*, Court of Common Pleas Decision at 2, 4.

(3) Prior to the policy period, no insured * * * knew that bodily injury or property damage had occurred, in whole or in part. If insured * * * knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.[203]

Considering this provision and the underlying complaints, the Ohio trial court found that the opioid epidemic existed years before the relevant policy period, the insured allegedly filled suspicious orders prior to the policy period, and the insured allegedly knew that its actions created or assisted in the creation of the alleged public nuisance.[204] As stated above, this decision was recently reversed.[205] The Ohio First District Court of Appeals held, in relevant part:

> A loss-in-progress provision is included in an insurance contract because insurance policies are only meant to cover fortuitous events, not losses that are certain to occur. The awareness that there is a risk that an insured's conduct might someday result in damages is not equivalent to knowledge of the damages.
>
> In this case, it is unclear at this stage in the proceedings whether some of the governmental entities' damages, such as increased costs for medical and addiction treatment, were due to diversion of [the insured's] products or were known to [the insured] prior to the policy period. We agree that [the insured] may have been aware there was a risk that if it filled suspicious orders, diversion of its products could contribute to the opioid epidemic, thus causing damages to the governmental entities. But, we hold that mere knowledge of this risk is not enough to bar coverage under the loss-in-progress provision.[206]

This Court finds the Ohio First District Court of Appeals' reasoning persuasive. Indeed, ACE concedes that the "same pre-2015 allegations" made in the underlying complaints in *Acuity* are alleged against Rite Aid in the Track One Lawsuits.[207] The language in this "loss-in-progress" provision is also substantively the same as the "prior knowledge" provision cited by ACE. Accordingly, the Court finds the pre-2015 allegations made by the plaintiffs in the Track One

---

[203] *Acuity*, 2020 WL 3446652, ¶ 32.
[204] *Acuity*, Court of Common Pleas Decision at 9–10.
[205] *See generally Acuity*, 2020 WL 3446652.
[206] *Id*. ¶¶ 49–50 (citations omitted).
[207] ACE's Opp. at 31–32.

Lawsuits cited by ACE might show, at most, the mere knowledge of a risk on the part of Rite Aid, which is not sufficient to bar coverage under this "prior knowledge" provision.[208]   Here, Rite Aid also contends that the Policy "applies" to each separate person's bodily injury occurring during the policy period.  Construing the Policy in favor of the policyholder, the Court finds that this is a reasonable interpretation of the plain language of the Policy.  Thus, even if it the plaintiffs in the Track One Lawsuits or other Opioid Lawsuits eventually show Rite Aid knew it injured certain persons before 2015, this does not necessarily demonstrate that it also knew it injured different persons in 2015.

As for ACE's known loss doctrine defense, relevant "losses" "for purposes of applying the known loss doctrine . . . [are] not simply the [bodily injuries or] the property damage itself, but the insured's liability for the [bodily injuries or] the property damage."[209]  The fact people abused opioids before 2015 does not make it a "known loss."  For the known loss doctrine to apply, there must be evidence showing the insured is charged with knowledge, before the Policy's inception date, which reasonably shows that it was, or should have been aware of "a likely exposure to losses which would reach the level of coverage."[210]  The governmental entities in the Track One Lawsuits began advancing this recently developed, novel legal theory in 2017, and only against Rite Aid in 2018.[211]  Accordingly, the complaints' allegations in the Track One Lawsuits do not constitute evidence of Rite Aid's knowledge.

---

[208] *See id.;* Cuyahoga TAC ¶¶ 14, 627, 628, 632, 715; Summit TAC ¶¶ 14, 627, 652, 653, 690.
[209] *State v. Hydrite Chemical Co*., 695 N.W.2d 816, 828 (Wis. 2005) (describing "majority view" for applying the known loss doctrine) (citing, *inter alia*, *Rohm and Haas Co.*, 781 A.2d at 1177).
[210] *Rohm and Haas Co*., 781 A.2d at 1177.
[211] Rite Aid's Reply Br. at 21–22.

## VI. CONCLUSION

For the foregoing reasons, Rite Aid's Motion is **GRANTED** and Chubb's Motion is **DENIED** with respect to the 2015 Policy.  Because the Court finds there is coverage under the 2015 Policy, Chubb's Motion is also **DENIED** as moot with respect to the other 18 policies.  In regard to the Responses from the Great American Defendants and the Certain Excess Insurers Defendants, this is not a ruling on their obligations under their respective policies, but the Court is not limiting any of the implications of this decision.

Dated: September 22, 2020
Wilmington, Delaware


*/s/ Eric M. Davis*
Eric M. Davis, Judge


cc: File&ServeXpress